[L. A. No. 19230. In Bank. June 24, 1947.]

Guardianship of the Person and Estate of WILLIAM RONALD LEACH, a Minor. E. MAE McCALLOM, Respondent, v. F. PAUL HORNADAY, as Guardian, etc., Appellant.

[L. A. No. 19231. In Bank. June 24, 1947.]

Guardianship of the Person and Estate of PATRICIA LEE JACOBSON, a Minor. E. MAE McCALLOM, Respondent, v. F. PAUL HORNADAY, as Guardian, etc., et al., Appellants.

Dechter, Hoyt, Pines & Walsh, B. L. Hoyt and Baldwin Robertson for Appellants.

S. L. Kurland, A. C. Ackerson and George R. Maury for Respondent.

SHENK, J.—In these consolidated guardianship proceedings, judgments were rendered removing F. Paul Hornaday as guardian of the persons and estàtes of his two wards, William Ronald Leach and Patricia Lee Leach. Appeals have been taken from the judgments of removal and from the various incidental orders entered in the course of the proceedings.

The determination of the appeals from the judgments will dispose of all matters presented by the other appeals. The determinative question is that of the sufficiency of the evidence to support the findings and judgment. The findings fall into two main groups, first, those which deal with the management and proposed sale by Hornaday of a company owned by his wards, and his acquisition of an adverse interest as ground for his removal as guardian; second, those which deal with the subject of an alleged marriage conspiracy as ground for removal.

The primary facts are these: About 1926, or prior thereto, Vivian Armeger Leach, also known as Val Leach, organized the Leach Relay Company. The concern, although not large, was successful, and was engaged principally in the manufacture and distribution of electrical relays. Val Leach married Mrs. Opel Jacobson, a widow with a minor daughter, Patricia. A son, William Ronald, was the issue of the marriage of Val and Opel.

In 1941, Val incorporated the Leach Relay Company and became the owner of all of the issued and outstanding stock, 5,200 shares. He died on October 1, 1941. In the probate of his estate his wife Opel succeeded to all of the corporate stock.. At the time of the death Val and Opel were having domestic trouble. In this difficulty Opel was being represented by F. Paul Hornaday, an attorney who had been engaged in the practice of the law since 1925 in Los Angeles.

In August, 1942, Opel died testate. Her will named Hornaday as executor of her estate and nominated him guardian of the persons and estates of both minor children, Patricia then about sixteen years of age and William about nine. The will directed Hornaday to consider the love for the children on the part of their maternal grandmother E. Mae McCallom, to consult with her and to give the children the benefit of her association. Each child was to receive one-half, or 2,600 shares, of the stock of the Leach Relay Company.

The will was admitted to probate and Hornaday became executor. In September, 1942, on his petition, letters of guardianship were issued to him of the persons and estates of the minors. In the Opel Leach estate the stock was appraised at $250,000 and in the estates of the minors each respective half interest was appraised at $125,000. When the Opel Leach estate was closed in 1944 the stock was distributed to Hornaday as guardian of the minors.

The deaths of Val and Opel Leach left the relay company without a guiding hand. Its affairs were in the hands of employees who had no investment or financial interest in the company. In the ten months preceding October, 1942, the company had paid approximately $23,000 in dividends and had then suspended the payment of further dividends. In order to pay the inheritance and federal estate taxes in the Opel Leach estate, Hornaday, as executor and guardian, and after securing an order from the probate court, borrowed $97,500 from the company, executing guardianship notes therefor. For the guardianship estates to be able to repay that sum from dividends, it would have been necessary, because of the high federal income tax rates, for the company to have declared dividends of about $400,000. Hornaday, as executor of the Opel Leach estate and as guardian of the minors who were the equitable owners of all of the corporate stock, was entitled to vote all of the stock, and to that extent to control the operation of the company.

In October, 1942, Hornaday took complete charge of the management and operations of the concern. He caused himself to be appointed general manager and president of the corporation. He caused to be elected as the entire membership of the board of directors, himself, one June Edwards who was, prior to her appointment as director, his secretary, and his then attorney and office associate, Cyril A. Walton. These persons were under his domination and control and

were subservient to him. They served as and constituted a majority of the directors from October, 1942, to September, 1944. While others served for various periods on the board, Hornaday at all times exercised complete control over the several boards and over the policies of the company. Walton was made vice-president of the company, and June Edwards, in addition to being director, was made secretary-treasurer and treasurer. Her salary for the latter offices was $100 a week, and she received a director's fee of $25 a week. At times her rate of compensation fluctuated to over $7,800 a year.

In November, 1942, Hornaday filed in each guardianship estate a petition for instructions setting forth the condition of the company, his right to vote all stock, and his proposal to act as chief executive and president—work which would take his full time. He proposed to receive a salary from the corporation in keeping with his position and duties, and to waive, during any period in which he received the corporate salary, all statutory and extraordinary fees to which he would be entitled as guardian of the respective estates. The court (Judge Jess E. Stephens) sanctioned this procedure by a written order made December 11, 1942. Under this arrangement, although he had previously been drawing compensation at higher annual rate, Hornaday agreed to accept from January, 1943, an annual salary and bonus of about $25,000. At approximately the same time the salary of Mrs. Edwards was stabilized at $5,300 a year. In addition both she and Hornaday continued to draw a weekly director's fee of $25.

In February, 1943, the paternal grandmother of William Ronald, Lena E. Shannon, filed a petition charging Hornaday with use of his position as guardian and executor for his personal profit, and she prayed to be appointed guardian *ad litem*. A hearing on this petition resulted in a finding that it would be in the interest of peace and harmony in the care of the boy to have his grandmother act jointly with Hornaday as guardian of his person, but not of his estate. In April, 1943, a judgment was entered favorable to Hornaday, but awarding counsel for the grandmother a fee of $1,000. An appeal was later dismissed. The judgment attests the fact that Hornaday was not chargeable with waste or mismanagement of the boy's estate up to April, 1943.

In June, 1943, the maternal grandmother of William Ronald, E. Mae McCallom, filed a petition seeking appoint-

ment as guardian of his person. At the same time she filed a similar petition in the estate of Patricia. She charged Hornaday with ignoring the testamentary request of Opel that the children be given the benefit of association with their grandmother, and with attempting to separate the children from her. At this time the feeling between the McCallom family and the Hornaday family had become very bitter. The children were practically forced to a choice, and placed their loyalty and preference for a home with the Hornaday family during the periods of their freedom from their respective boarding schools. The court proceedings terminated in a dismissal of both petitions.

During the period of Hornaday's management of the company there had been a gradual steady improvement in its financial condition. The concern had engaged in defense work at the outbreak of World War II, and after October, 1942, its business was almost 100 per cent war production for the armed forces. The increase in volume reached 1,400 per cent and continued to rise.

Because of the rapid growth of the company, its accumulation of cash, and the consequent renegotiation and tax problems, there was an alleged desire on the part of Hornaday to have some of this cash reserve pass into the estates of the minors in such a way as to avoid, to the benefit of the guardianship estates, the heavy income tax which would have to be paid by each ward if the transfer were made through a declaration of dividends by the company. There was also the necessity of repayment to the company by the minors' estates of the $97,500 borrowed to pay estate and inheritance taxes in the Opel Leach estate. It was recognized that the rapid expansion of the business was due to war conditions and that its continuing prosperity after the war was speculative, thus presenting the question whether a present sale of the company would not bring the children a better inheritance than an attempt to hold and readjust the business to post-war conditions. In weighing these factors Hornaday sought the counsel of his associates and of his attorney.

In March, 1944, in each estate, Hornaday filed a petition for instructions concerning the sale of the company, setting forth a proposed plan of procedure. On April 13, 1944, in the estate of William Ronald, E. Mae McCallom filed a petition attacking Hornaday's plan of sale and prayed to be appointed guardian *ad litem* of the minor. This petition

was granted by Judge Willam R. McKay, whereupon E. Mae McCallom filed formal objections to the petition for instructions concerning the proposed sale. On April 27th this was supplemented by a petition alleging grounds for removal of Hornaday and praying for further appointment as guardian *ad litem* to prosecute a removal proceeding. This petition too was granted by Judge McKay, and E. Mae McCallom thereupon filed a formal petition for removal. On May 8th Hornaday filed a plea in bar, and on the same day he filed in each estate his first account current. This too was made the target for objections by Mrs. McCallom, but in August, 1944, Judge McKay entered a decree in each estate settling the account.

Meanwhile, and on July 10, 1944, in the estate of Patricia, E. Mae McCallom petitioned for the removal of Hornaday as guardian, charging that he had acquired and attempted to acquire interests adverse to the faithful performance of his duties as fiduciary and guardian in connection with his management and proposed sale of the company. On the same day the court, of its own motion, based upon the verified petition of Mrs. McCallom and upon information before it, and after the refusal of Patricia to consent thereto, issued its citation to Hornaday to show cause why he should not be removed as guardian of the person and estate of Patricia. Hornaday filed a return and answer and it was stipulated that evidence theretofore submitted in the removal proceedings in the estate of William Ronald would be deemed in evidence in the removal proceeding in the estate of Patricia.

In September, 1944, Patricia filed a petition alleging that on August 14, 1944, she had attained the age of eighteen years and that she did not consent to the appointment of Mrs. McCallom as her guardian *ad litem,* and she prayed for the substitution of attorney Burdette J. Daniels to represent her in the proceedings relative to the proposed sale of the company and the removal of Hornaday.

On September 25, 1944, in each estate, Mrs. McCallom filed a supplement to her removal petition alleging further misconduct on the part of Hornaday. Previously, in November, 1943, Hornaday had employed his thirty-four-year old brother Delyn, also known as W. H. D. Hornaday, Jr., or ''Dr.'' Hornaday (herein referred to as ''Delyn''), as production superintendent of the company at a salary of $9,000 a year. Before receiving this employment, Delyn had had no training

in the technical matter of relay manufacturing. His previous experience was varied. He had helped his father; he had gone to the Orient with an orchestra; he had written a novelty article entitled "Ant Village"; he had been a masseur in a doctor's office; and in 1940 or 1941 he had taken a job at California Shipyards and worked as helper, learner, and finally as a supervisor. Patricia had met Delyn and claimed to have fallen in love with him. Mrs. McCallom charged that the love affair was the result of conspiracy; that Hornaday, having failed in his scheme to acquire the property of the minors for himself through his proposed sale of the company, had unlawfully conspired with Delyn and others to have Delyn and his then wife proceed to the State of Nevada and there establish a residence for the sole and fraudulent purpose of obtaining a divorce, whereupon Delyn would enter into a purported bigamous marriage with Patricia; that this would enable Patricia to attain an apparent majority and thereby divest the court of jurisdiction over her person and estate and terminate the guardianship proceedings; and that Patricia would thereby be left under the influence of and subject to Hornaday's control of her affairs because of her affection for him and marriage to his brother.

Following the filing of Hornaday's return and answer to this petition, and on October 13, 1944, Patricia filed a petition to terminate the guardianship on the ground that on October 9, 1944, at Las Vegas, Nevada, she had entered into a marriage ceremony with Delyn, and had thus attained her majority (Civ. Code, § 25). No hearing was had on this petition and the court, in its findings in these removal proceedings, stated that the petition was still pending. However, E. Mae McCallom supplemented her removal petition by setting forth the fact that the alleged marriage ceremony had actually taken place.

After a hearing of these matters, and on November 14, 1944, there was entered in each estate a minute order which recited the following rulings by the court (Judge Joseph W. Vickers): Dismissal of the petition for sale of the company; granting the petitions for removal of Hornaday as guardian of the persons and estates of both minors; directing that a separate order be entered, to take immediate effect, suspending his powers; finding that the Nevada divorce of Delyn was void; finding that the guardian had mismanaged the estate, abused his trust, and acquired an interest adverse

to the faithful performance of his duties; appointing E. Mae McCallom special guardian of the estates of both minors and of the person of William Ronald, until further order of the court, with bonds fixed at $150,000 in each estate; and holding in abeyance the appointment of a guardian of the person of Patricia.

On the same day a written order was made in each estate suspending the powers of Hornaday as guardian under section 1581 of the Probate Code. On the following day, November 15, 1944, a written order was made in each estate appointing E. Mae McCallom special guardian as directed in the minute order. Hornaday gave notice of appeal in each estate from the minute order and from the two written orders which followed it.

On November 17, 1944, on additional petitions of E. Mae McCallom, the court, in each estate, made a further order appointing her guardian of the person and estate of William Ronald and of the estate of Patricia, pending determination of the appeals from the orders suspending Hornaday, and directing Hornaday to turn over to her all of the property of the estates. Hornaday gave notice in each estate of appeal from these orders.

On December 27, 1944, in each estate, the court (Judge Vickers) filed findings of fact and conclusions of law, and entered judgment removing Hornaday as guardian of the persons and estates of the minors, and awarding petitioner McCallom her costs. Hornaday appealed from both judgments. Patricia appealed separately through her then guardian *ad litem,* Baldwin Robertson, and also an emancipated married woman, from the decree of removal in her estate, and particularly from any attempt by the court, as a basis for the decree, to adjudicate the validity of her marriage to Delyn.

The judgments of removal are sufficiently supported by the evidence and findings bearing upon Hornaday's proposed sale of the company and his acquisition of an interest adverse to that of his wards. Nothing more is required to substantiate this statement than a consideration of the proposed plan of sale submitted by Hornaday and the testimony showing that he took practically no action to encourage offers or hasten the submission of bids by disinterested persons.

The court found, and the evidence shows, that as of approximately April 1, 1944, the corporation had $1,500,000

current assets, in addition to $128,000 post-war excess profits tax credits, $157,750 net value of fixed assets, and $11,000 in prepaid and deferred assets; that the current assets consisted of in excess of $429,000 in cash on hand as of the close of business on February 29, 1944, and $596,000 in accounts receivable, of which almost all were current; that the merchandise inventory was not less than $350,000; that these assets were subject to certain liabilities, including those for accrued and estimated tax liabilities and reserves, and reserves for renegotiation, in the sum of about $1,084,468; that the corporation had a total capital and surplus of $1,782,865.64; that the estimated net profit of the corporation for the eight months from July, 1943, to February, 1944, after taking out all taxes and expenses, was about $226,674.14, subject to renegotiation; that the last prior month for which an earnings statement was available was February, 1944; that the net profits for that month were $138,374.34, with estimated income and excess profits tax of $101,290.01, leaving a net profit for the month, after deduction of all charges and taxes of $37,084.33.

The proposed sale set forth in Hornaday's petition for instructions was that of substantially all of the estate of the minors, consisting of all of the shares of stock of Leach Relay Company, Inc., to another corporation, alleged to be a California corporation, known as the Leach Relay Corporation. The consideration was to be the retirement of the $97,500 note owed by the minors' estates to the company; $250,000 in cash; and $150,000 in ten noninterest bearing notes of the new corporation, payable serially over a period of ten years. Until payment of the $150,000 the new corporation was to declare no dividends. It was to give the minors an option to purchase its stock for $5,000 within ten days after final payment on the deferred balance of $150,000. By a proposed separate contract with Hornaday, the new corporation was to bind itself to employ him in his individual capacity, and not as guardian, for a ten-year period at an annual salary of $25,000 a year, but he was to have the option of terminating the contract, if he so desired, at the end of any two-year period during its term.

The evidence shows that at the time Hornaday presented his plan to the court he had already caused the formation of the new corporation, in Nevada and not in California as represented; that all of its officers, directors, and stock-

holders were residents of Nevada, acting solely for Hornaday; that the total authorized stock of the new corporation of $75,000 was issued to its officers, directors, and stockholders for no consideration whatsoever and that no consideration for it was contemplated to be paid at any time. Prior to filing his petition for instructions Hornaday had caused to be prepared all of the instruments for dissolution of the old company, and he intended to execute and cause them to be filed immediately upon obtaining the court's approval of the plan.

It was shown and the court found that the incorporators, officers and directors of the new corporation, to whom all of its stock had been issued without consideration, were "dummies and strawmen" of Hornaday, under his domination and control; that Hornaday intended the court's approval of the sale to the new corporation to result in, and it would have resulted in, the obtaining by Hornaday of the ownership and control of all of the stock and assets of the California corporation for himself as an individual, and not as guardian for the minors, and free and clear of all their claims, and it would have placed the ownership and control of the corporation beyond the jurisdiction of any California court. Hornaday's interest in the Nevada corporation, the court found, was and is an interest adverse to the faithful performance of his duties as guardian of the persons and estates of the minors.

The court found that the sale was to be accomplished by a transfer of both the assets and stock of the California corporation to the Nevada corporation, and that Hornaday intended to pay the consideration for the transfer and purchase solely and entirely from the earnings and assets of the California corporation; that although Hornaday alleged in his petition for instructions that he had no interest for personal gain under the proposed plan, he in fact intended as an individual to have sole control of the new corporation through his dummies and strawmen; that also he, as an individual and not as guardian, intended to enter into and caused to be prepared the contract with the Nevada corporation whereby he would be its exclusive manager for a period of ten years, with an option at his pleasure only to renew or cancel such contract at the end of each two-year period within the ten years, without regard to the payment to the minors of the promissory notes owing to them by the Nevada corporation on the so-called purchase price, and

without regard to the earnings of the new corporation or its ability to meet its obligations in matters pertaining to the welfare of the minors.

It was further found that in his petition for instructions Hornaday represented to the court that the proposed sale would result in the realization to the minors of the greatest possible sum from their estates, whereas in fact the Commissioner of Internal Revenue would have treated all consideration so moving to the minors' estates as income from the company and would have exacted an income tax therefrom such that the minors' estates would have·become liable to the United States government for sums greater than those to be received from the proposed sale; that, in other words, the proposed sale would have given the minors nothing more than a cancellation of their note to the California corporation and would have resulted in their immediate tax liability to the United States government, in addition to taxes which might become owing to the State of California, which liability would have been more than the cash and notes to be paid in consideration of the sale; that thus the minors would have been deprived entirely of that portion of their inheritance represented by their ownership of the company.

The court found that prior to the filing by Hornaday of his petition for instructions, other persons had expressed an interest in the purchase of the company but had told the court that they were unable to obtain any cooperation which would enable them to prepare bids intelligently; that the court instructed Hornaday to file a petition setting forth the entire matter so as to obtain the highest and best bid for the company; that, however, Hornaday's petition for instructions did not reveal the fact that others were interested in purchasing the company; that it alleged only that the proposed sale was for the best interest of the minors.

The court found that at all times Hornaday obstructed the procuring of bona fide and high bids from others than himself by refusing to report to proposed bidders the true value of the assets of the company or to have an audit made of assets and earnings; that by his conduct and oral declarations Hornaday discouraged and dissuaded bidders and potential bidders, and voluntarily expressed adverse opinions of the value and future of the corporation to prospective purchasers.

After the hearing on the petition for instructions the court directed Hornaday not to continue with his plan of

proposed sale. Thereafter, at the court's suggestion and with consent of all parties, the court ordered that a sale proceed by sealed bids presented directly to the court. The audit was not completed, nor was a sale effected, until after the close of the proceedings here under review which terminated in the judgments of removal.

In attacking the findings relative to his acquisition of an adverse interest, Hornaday argues that since he did not petition the court directly to approve the proposed sale, but merely asked for instructions whether he should proceed with the plan, it cannot be concluded that he thereby acquired or attempted to acquire an adverse interest. He argues that a guardian, by merely placing his problem before the court, cannot as a matter of law be held accountable for an attempt to commit waste, mismanagement, abuse of trust, or acquisition of an adverse interest. He asserts that his associates were consulted and that the plan was conceived and worked out by his attorney, who frankly admitted responsibility for it; that he himself is not a tax expert, and that he relied, as he was entitled to do, upon outside advice in his endeavor to solve the tax problem involved in getting money from the corporation into the minors' estates. He also claims that the court had no right to find, as a fact, that the Commissioner of Internal Revenue would have treated all of the consideration moving to the minors' estates as payment of dividends or taxable income, when the matter of what the commissioner's attitude would have been, had the plan been consummated, is a subject of speculation. He states that when the deficiencies in the plan became apparent, he did not question the wisdom of abandoning it, and that the prosperous condition of the company belied the charge that he attempted to commit waste or mismanagement. In short, he claims that the evidence fails to establish any act on his part which would constitute a cause of removal listed in section 1580 of the Probate Code, and that a guardian may not be removed for any cause not specified in that statute.

Section 1580 specifies the causes for the removal of a guardian by the court including the acquisition by the guardian of "an interest adverse to the faithful performance of his duties" (subd. 5). That Hornaday did in fact conduct himself in a manner "adverse to the faithful performance of his duties" as a guardian is shown by the evidence which

the court chose to credit and by the inferences which might reasonably be drawn from such evidence.

The evidence although conflicting affords substantial support for the findings and conclusions that Hornaday acquired an interest adverse to that of his wards. These matters all transpired subsequent to the acts which formed the basis for the charges made in the Shannon removal proceeding in the estate of William Ronald, and the issues here raised were not there adjudicated. ■ The doctrine of res adjudicata does not apply to successive applications for appointment or removal in the guardianship of minors to the extent of precluding the court, upon a later application, from a consideration of such circumstances as may have occurred subsequent to rendition of the prior order. (*Guardianship of Snowball*, 156 Cal. 240, 242 [104 P. 444]; *Guardianship of Case*, 57 Cal.App.2d 844, 847 [135 P.2d 681].)

The appeal of Patricia is separately briefed. She joins in all grounds for reversal urged by Hornaday but directs her main argument against the findings of fact and conclusions of law to the effect that the purported Nevada divorce of Delyn and his wife Phyllis was void; that the purported marriage of Delyn and Patricia was likewise void; and that by that marriage Patricia did not attain her majority.

These facts were found and conclusions drawn in connection with the court's findings that Hornaday conspired with others to effect a premature termination of the guardianship by inducing a purported marriage of Delyn and Patricia through which the latter would be emancipated. In view of the sufficiency of the evidence to support the findings and judgment of removal on other grounds, a determination of the question of the sufficiency of the evidence to support these conspiracy findings is not necessary to this decision.

The court made no adjudication that the divorce of Delyn and Phyllis and the marriage of Patricia and Delyn were invalid. The findings and conclusions on this subject related solely to certain facts in connection with the alleged conspiracy and the effect thereof was not carried into the judgment. ■ An adjudication of the validity of the divorce of Delyn and Phyllis, neither of whom is a party to this proceeding, or as to the validity of the marriage of Delyn and Patricia, was not essential to the judgment of removal nor appropriate in this proceeding. ■ It is well settled that the findings and conclusions of the court do not have

the force and effect of an adjudication where the subject matter is not disposed of by the judgment. The force of an adjudication rests in the judgment itself, and findings not necessary to the judgment are no wise conclusive. (Code Civ. Proc., § 1911; *Lang* v. *Lang,* 182 Cal. 765, 768 [190 P. 181]; *Hartfield* v. *Howard,* 180 Cal. 376, 379 [181 P. 385]; *Wardlow* v. *Middleton,* 156 Cal. 585, 586-7 [105 P. 738]; *Bank of Visalia* v. *Smith,* 146 Cal. 398, 402 [81 P. 542]; *Birkhofer* v. *Krumm,* 27 Cal.App.2d 513, 543 [81 P.2d 609]; *Purcell* v. *Victor Power etc. Co.,* 29 Cal.App. 504, 510 [156 P. 1009]; 15 Cal.Jur. pp. 153 et seq., § 199; 30 Am.Jur. p. 931, § 184.) The finding here of the invalidity of the marriage was not necessary to the judgment because the gravamen of the misconduct charged was failure to protect the ward and the alleged conspiracy to effect a premature termination of the guardianship by marriage, actual or purported; and that this alleged misconduct occurred prior to the marriage ceremony.

It is true that an adjudication of the validity of the marriage of Delyn and Patricia might have been essential to a determination of Patricia's petition to terminate the guardianship by reason of that marriage, but the court expressly found that petition to be still pending and undetermined.

Patricia claims to have been greatly prejudiced by the appointment, without her consent, of Mrs. McCallom as special guardian upon the suspension of the powers of Hornaday as guardian. However, the record contains no evidence or finding bearing upon the assertions made. In fact it was stipulated at the time Mrs. McCallom was appointed that she would resign as special guardian of each estate at any time the court so requested in order that another might be appointed in her stead.

Patricia has applied to this court for permission to introduce documentary evidence to establish the validity of her marriage. She has also applied for her substitution, *sui juris,* as appellant herein in the place of Baldwin Robertson, her guardian *ad litem.* The documents sought to be introduced all relate to matters occurring subsequent to entry of the judgments of removal. They do not bear upon issues adjudicated by those judgments but upon issues raised by the petition to terminate the guardianship. Since that petition was still pending at the close of the present proceeding in the trial court, the documents are not relevant to any

matter involved in these appeals. There is therefore no ground upon which this court may properly grant the application for the substitution, of Patricia *sui juris,* as a party appellant.

The application of Patricia Lee Leach for substitution, *sui juris,* as party appellant in the place of Baldwin Robertson, her guardian *ad litem,* is therefore denied. Her application now to introduce certain documents in evidence and to have this court make findings thereon contrary to those made by the trial court, is likewise denied. The appeals from the incidental orders are dismissed. The judgments of removal appealed from herein are affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.